1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE ALEMAN M.,[1] <br><br> Plaintiff, <br><br> v. <br><br> LELAND DUDEK, Acting COMMISSIONER OF SOCIAL SECURITY,[2] <br><br> Defendant. | Case No. 2:24-cv-01391-PD <br><br> **MEMORANDUM OPINION AND ORDER AFFIRMING COMMISSIONER** |

Plaintiff challenges the denial of her application for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). For the reasons discussed below, the decision of the Administrative Law Judge is affirmed.

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the United States Judicial Conference Committee on Court Administration and Case Management.

[2] Leland Dudek, who was appointed Acting Commissioner on February 17, 2025, is substituted in as the correct Defendant. *See* Fed. R. Civ. P. 25(d).

# I.    PERTINENT PROCEDURAL HISTORY AND DISPUTED ISSUES

On January 24, 2020, Plaintiff protectively filed applications for DIB and SSI, alleging disability beginning February 9, 2018, from diabetes, neuropathy, "[d]iabetic retinopathy," "bulging discs," and sciatica. [Administrative Record ("AR") 15, 318-19, 326, 350.]  Plaintiff's applications were denied initially and on reconsideration.  [AR 117-18, 159-60.]  She requested a hearing, which was held before an ALJ on May 4, 2022.  [AR 32-53.]  Plaintiff appeared with counsel, and the ALJ heard testimony from her and a vocational expert ("VE").  [AR 32, 36-52.]  On February 15, 2023, the ALJ found Plaintiff not disabled under the Social Security Act ("SSA").  [AR 15-25.]  Specifically, the ALJ determined that Plaintiff met the special earnings requirements through March 31, 2019, the date last insured ("DLI").  [AR 18.]  The ALJ then followed the requisite five-step sequential evaluation process to assess whether she was disabled under the SSA.  *See Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996), *superseded on other grounds by regulation as stated in Farlow v. Kijakazi*, 53 F.4th 485 (9th Cir. 2022); 20 C.F.R. §§ 404.1520(a), 416.920(a).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 9, 2018, the alleged onset date.  [AR 18.]

At step two, Plaintiff had severe impairments of "degenerative disc disease of the lumbar and cervical spine," neuropathy, diabetes, fibromyalgia, "adhesive capsulitis of the left shoulder," "rotator cuff syndrome," and "obesity status/post gastric surgery."  [Id.]  She concluded that several of Plaintiff's impairments, including her "cataract and diabetic retinopathy with macular edema," were not severe.  [AR 18-19.]

At step three, she found that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  [AR 19-20.]

At step four, Plaintiff had the RFC to perform light work except that she could

> lift and/or carry 20 pounds occasionally and 10 pounds frequently; she c[ould] stand, walk, and sit each for six hours in an eight-hour workday; she c[ould] frequently reach, handle, finger, feel, push, and pull with the right, dominant upper extremity; she c[ould] occasionally reach, push, and pull with the left upper extremity and . . . frequently use her left hand for handling, fingering, and feeling; she c[ould] occasionally operate foot controls bilaterally; she c[ould] occasionally crouch and climb ladders, ropes, scaffolds, stairs, and ramps; she c[ould] frequently stoop, kneel, and crawl.

[AR 20.]

The ALJ concluded that Plaintiff was able to perform her past relevant work as a photographer. [AR 24.] Accordingly, she concluded that Plaintiff did not meet the SSA's definition of disability from the alleged onset date through the date of the decision. [AR 24-25.]

Plaintiff raises four issues:

(1)    Whether the ALJ erred in finding that Plaintiff's visual impairments were nonsevere and warranted no work restrictions.

(2)    Whether the ALJ properly evaluated the consultative internal-medicine examining doctor's statements.

(3)    Whether the ALJ properly evaluated Plaintiff's subjective symptom statements and testimony concerning her diabetic polyneuropathy.

(4)    Whether the ALJ properly resolved an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles.

[See Dkt. No. 12 at 6-20.]

16-22.]

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the agency's decision to deny benefits. A court will vacate the agency's decision "only if the ALJ's decision was not supported by substantial evidence in the record as a

whole or if the ALJ applied the wrong legal standard." *Coleman v. Saul*, 979 F.3d 751, 755 (9th Cir. 2020) (citations omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Id.*; *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (same).

It is the ALJ's responsibility to resolve conflicts in the medical evidence and ambiguities in the record. *Ford v. Saul*, 950 F.3d 1141, 1149 (9th Cir. 2020). When this evidence is "susceptible to more than one rational interpretation," the ALJ's reasonable evaluation of the proof should be upheld. *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Tran v. Saul*, 804 F. App'x 676, 678 (9th Cir. 2020).

Error in Social Security determinations is subject to harmless-error analysis. *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012). Error is harmless if "it is inconsequential to the ultimate nondisability determination" or, despite the legal error, "the agency's path is reasonably discerned." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citation omitted).

## III.    DISCUSSION

### A.    The ALJ Did Not Err in Finding Plaintiff's Visual Impairments Nonsevere and Warranting No Work Restrictions

Plaintiff argues that the ALJ erred in finding her visual impairments nonsevere and in finding that they warranted no work restrictions. [Dkt. No. 12 at 6-10.] She contends that she "consistently exhibited poor visual acuity in her left eye" despite receiving "regular intraocular injections in her eyes" to treat "blurred vision and floaters resulting from her cataracts and diabetic retinopathy with macular edema." [*Id.* at 6.]

#### 1.    Applicable law

At step two of the sequential evaluation process, a plaintiff has the

burden to present evidence of medical signs, symptoms, and laboratory findings that establish a medically determinable physical or mental impairment that is severe, and that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1004–05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(A)); §§ 404.1520, 416.920. Step two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citation omitted).  The "severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs." SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985).  Basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations." *Id.*

### 2.    The ALJ's Decision

The ALJ noted that Plaintiff

> testified that she received injections in her eyes every six weeks, to manage swelling, and while the medical record generally supports this testimony, in February 2022, she reported that she had not followed up "in a while."  She reported having blurred vision, floaters, and various associated functional limitations. In 2020, an internal medicine consultative examiner characterized [Plaintiff's] visual acuity as "severely decreased" on the left, at 20/200, and "moderately decreased" on the right, at 20/40.  However, approximately one month later, a progress note from Win Retina indicated 20/30+1 acuity on the right and 20/70-2 on the left.  Other optometry records suggest that [Plaintiff's]

visual acuity varied, particularly on the left.  An optometrist who examined [Plaintiff] in 2022 remarked that she had good central vision in her right eye, was not legally blind, and had good peripheral vision.

There is no indication that her visual impairments have more than a minimal effect on [Plaintiff's] ability to do basic work activities.  For example, she testified that she was alone most of the time during the day and the internal medicine consultative examiner noted that she was able to "visually move around the office."  Further, there is no indication that she used prescribed eyeglasses and she denied having any vision-related difficulty with driving.  Occupational therapy records document improved visual function with various workarounds.

[AR 19 (citations omitted).]

### 3.    Analysis

The ALJ properly found Plaintiff's visual impairments nonsevere [see AR 18-19] and not warranting work limitations [*see* AR 20-21].  The record documented that Plaintiff had a history of vision complaints [*see* AR 463-83] and was diagnosed with cataract and diabetic retinopathy with macular edema [*see* AR 483, 1044].  But her visual acuity varied, as the ALJ noted. [AR 19 (citing AR 577, 1045).]  She was assessed "severely decreased" visual acuity in the left eye in September 2020, but her left-eye vision had improved significantly just a month later.  [*Id*. (citing AR 577, 579, 1045).]  In February 2022 she was noted to have "good central vision in her right eye, was not legally blind, and had good peripheral vision."  [*Id*. (citing AR 1259).]  The same examiner found her vision "adequate for working."  [AR 1259.]

Plaintiff's doctor certified to the DMV in a 2018 "Driver Medical Evaluation" that neither her vision nor the medications prescribed for it "affect[ed] safe driving."  [AR 548.]  In fact, Plaintiff herself testified that she didn't "have problems driving" [AR 40], as the ALJ noted [AR 19], and that it was "mainly" her back and foot pain that prevented her from working [AR 38].  Indeed, the only visual functional limitations to which she points are her own

complaints of "trouble reading and watching TV." [Dkt. No. 12 at 8.] But she does not show how those issues, even if fully credited, had "more than a minimal effect on [her] ability to work" as a photographer. *Webb*, 433 F.3d at 686.

Plaintiff argues that even if her vision impairments were nonsevere, the ALJ erred in not considering their functional impact when formulating her RFC. [Dkt. No. 12 at 9.] But Plaintiff is incorrect that the ALJ did not do so. She discussed Plaintiff's vision issues in her analysis of the RFC, including the findings of the internal-medicine consultative examiner [see AR 21], and found that they did not warrant any work limitations [AR 20].

Further, even if the ALJ erred in finding Plaintiff's vision impairments nonsevere, any error was harmless. In light of Plaintiff's concession that she had no "problems driving," it appears that she "had at least the visual acuity necessary to take photographs," as Defendant argues. [Dkt. No. 19 at 5.] Plaintiff does not identify what additional visual limitations the ALJ should have included, what evidence supports such limitations, or how those limitations would have prevented her from performing the photographer job. *See Burch v. Barnhart*, 400 F.3d 676, 683-84 (9th Cir. 2005) (finding that ALJ adequately considered impairment in RFC determination because plaintiff did not "point[] to any evidence of functional limitations due to [impairment] which would have impacted the ALJ's analysis"). Plaintiff argues that the DOT "describes the duties of photographer as including the determination of subject-to-lens distance and adjusting focus, activities that would be disrupted by her left eye visual dysfunction." [Dkt. No. 20 at 5.] She offers no support for this argument, but simply asserts that "one does not need to be a vocational expert to know that a professional photographer must be able to see well to ensure proper focus, lighting, and environmental contrast, which all affect the quality of the photographs." [*Id.*] Plaintiff has identified no

7

medical opinion or other evidence suggesting that the level of visual dysfunction she suffered prevented her from performing these tasks. Therefore, any error was harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (error is harmless when it is "inconsequential to the ultimate nondisability determination" (citation omitted)), superseded on other grounds by §§ 404.1502(a), 416.902(a)..

### B. The ALJ Properly Evaluated the Opinion of Consultative Internist Seung Ha Lim in Fashioning the RFC

#### 1. Applicable law

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It reflects the most a claimant can do despite limitations. *Smolen*, 80 F.3d at 1291.  An RFC determination must be based on all the relevant evidence, including diagnoses, treatment, observations, and opinions of medical sources, such as treating and examining physicians.  20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for translating and incorporating supported medical evidence into a succinct RFC.  *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended).  It is the ALJ's responsibility to resolve conflicts in the medical evidence and ambiguities in the record.  *Ford*, 950 F.3d at 1149.  When this evidence is "susceptible to more than one rational interpretation," the ALJ's reasonable evaluation of the proof should be upheld.  *Ryan*, 528 F.3d at 1198.

The regulations for claims filed on or after March 27, 2017 apply here. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (Jan. 18, 2017), 2017 WL 168819; 20 C.F.R §§ 404.1520c, 416.920c.  These regulations provide that the ALJ will no longer "give any specific evidentiary weight . . . to any medical opinion(s)     . . . ." *Revisions to*

*Rules* 82 Fed. Reg. 5844, at 5867-68, 2017 WL 168819; *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. §§ 404.1520c(a) & (b), 416.920c(a) & (b). The factors for evaluating their persuasiveness include supportability, consistency, relationship with the claimant (including length of treatment, frequency of examinations, purpose of treatment, extent of treatment, and existence of an examination), specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding" (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements"). 20 C.R.F. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).

Supportability and consistency are the most important factors when determining persuasiveness. *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022). Supportability and consistency are explained in the regulations:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

§§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. §§ 404.1520c(b)(2), 416.920c(b)(2).).

9

1

2.    **Dr. Lim's Statements**

2

3    On September 28, 2020, internist Seung Ha Lim conducted a

4 consultative internal-medicine evaluation of Plaintiff.  [AR 576-79.]  Plaintiff

5 complained of diabetes, back pain, and blurry vision in both eyes.  [AR 576.]

6 During the examination, her grip strength was 25 pounds with the right hand

7 and 20 pounds with the left.  [AR 577.]  Otherwise, her strength was "5/5

8 throughout without focal motor deficits."  [AR 578.]  Her visual acuity was

9 20/40 in the right eye and 20/200 in the left.  [AR 577.]  She exhibited a slow

10 gait and complained of numbness of the lower extremities [AR 577-78] but

11 didn't require use of an assistive device for ambulation [AR 579].  She had

12 "normal range of motion of the back" but exhibited "pain on motion."  [AR

13 578.]  Her sensation was "decreased to soft touch in both lower extremities in

14 stocking distribution."[3]  [Id.]  She had an "absence of both ankle reflexes" [id.],

15 which Dr. Lim opined "suggest[ed] diabetic neuropathy" [AR 579].  Dr. Lim

16 noted that Plaintiff had "severely decreased visual acuity in the left eye and

17 moderately decreased visual acuity in the right eye that did not improve with

18 pinhole correction in the left eye."  [Id.]  Dr. Lim further stated:

> Based on available medical information, [Plaintiff], in my opinion,
> is restricted to standing and/or walking about 6 hours in an eight-
> hour workday with appropriate breaks.  [She] would be able to sit
> for 6 hours in an eight-hour day with appropriate breaks.  [She]
> would be able to lift and/or carry 20 pounds occasionally and 10
> pounds frequently.  Pushing and pulling is limited to occasional
> use of both lower extremities.  [She] has postural limitations such
> as occasional climbing and crouching.  [She] has visual limitations
> in the left eye.
>
> [Id.]

---

[3] The stocking distribution, or stocking-and-glove pattern, in peripheral
neuropathy from diabetes refers to symptoms often starting in the feet and toes,
followed by the hands and fingers.  *When Nerves Get Damaged*, Harvard Health
Publ'g: Harvard Med. Sch. (July 6, 2024), https://www.health.harvard.edu//
diseases-and-conditions/when-nerves-get-damaged.

10

### 3.    The ALJ's decision

The ALJ found Dr. Lim's

> limitations on exertion, postural activities, and pushing and
> pulling . . . persuasive.  Dr. Lim's objective findings support these
> limitations; for example, based on the height and weight he
> recorded, [Plaintiff's] body mass index . . . was 44.1.  Similarly,
> there was pain on range of motion in her back, her gait was slow,
> and in both lower extremities, sensation was decreased and ankle
> reflexes were absent.  Nonetheless, range of motion in [Plaintiff's]
> back and extremities was normal, motor function was intact, and
> no edema, cardiac, or pulmonary deficits were noted.  Further, Dr.
> Lim's specific exertional, postural, and pushing/pulling
> limitations are consistent with other medical evidence as
> discussed below.
> Dr. Lim indicated that [Plaintiff] had "visual limitations in the
> left eye," presumably based on the uncorrected visual acuity
> measurements of 20/40 on the right and 20/200 on the left.
> However, this conclusion is not persuasive, for several reasons.
> First, it is non-specific and thus has limited probative value.
> Moreover, [Plaintiff] denied wearing distance eye glasses and she
> was able to visually move around Dr. Lim's office.  Finally, the
> medical evidence discussed in Finding 3 reasonably suggests that
> [Plaintiff's] visual impairments do not have more than a minimal
> effect on her ability to do basic work activities.

[AR 21 (citations omitted).]

### 4.    Analysis

Plaintiff is incorrect that the ALJ "did not provide a substantive
discussion of her evaluation of the consistency factor" for Dr. Lim's opinion.
[Dkt. 12 at 12.]  The ALJ specifically stated that Dr. Lim's "exertional,
postural, and pushing/pulling limitations [we]re consistent with other medical
evidence as discussed below."  [AR 21.]  Plaintiff argues that this was
insufficient because the ALJ didn't make any "specific findings in this regard."
[Dkt. No. 12 at 12.]  But the ALJ went on to discuss the "other" medical
opinions she found consistent.  Specifically, she noted that Drs. J. Berry and
B. Vaghaiwalla opined that Plaintiff could engage in light exertion and

occasionally climb and operate foot controls, which is consistent with Dr.
Lim's opinion.  [AR 22 (citing AR 100-02, 132-35).]

Plaintiff argues that the ALJ failed to discuss the consistency factor
with respect to the opined "visual limitations" in the left eye.  [Dkt. No. 12 at
12 (citing AR 21); see AR 579.]  First, Dr. Lim's statement is not a medical
opinion because it did not state "what [plaintiff] can still do despite [any]
impairment(s) and whether [plaintiff] ha[s] one or more impairment-related
limitations or restrictions" in her "ability to perform other demands of work,"
§§ 404.1513(a)(2)(iii), 416.913(a)(2)(iii).  Medical opinions no longer encompass
"symptoms, diagnosis, and prognosis" as did former governing
§§ 404.1527(a)(1) and 416.927(a)(1).  Thus, the ALJ was not required to
evaluate or even consider the statement.  *See Melissa M. v. Comm'r Soc. Sec.
Admin.*, No. 2:24-cv-00528-JR, 2024 WL 4948851, at *2 (D. Or. Dec. 2, 2024)
(noting that revised regulations "more narrowly define" medical opinions and
finding that doctor's statement was "not a medical opinion because it d[id] not
articulate any work-relevant functional limitations"); *Carl C. v. Comm. Soc.
Sec.*, No. 2:21-cv-1454-DGE, 2022 WL 1134882, at *7 (W.D. Wash. Apr. 18,
2022) (finding that speech pathologist's statement was "not a medical opinion"
under §§ 404.1513(a) and 416.913(a) "as it did not describe [p]laintiff's
impairments or what he could still do despite his impairments").

Further, even if Dr. Lim's statement had been a medical opinion, the
ALJ sufficiently addressed the consistency factor.  In finding that statement
not persuasive, the ALJ noted that the "medical evidence discussed in Finding
3 reasonably suggests that [Plaintiff's] visual impairments do not have more
than a minimal effect on her ability to do basic work activities."  [AR 21.]  It
was acceptable for the ALJ to reference other portions of her decision in
explaining her consideration of Dr. Lim's opinion.  See Magallanes v. Bowen,
881 F.2d 747, 755 (9th Cir. 1989) (ALJ not required to recite "incantation"

such as "I reject [this doctor's] opinion about [this issue] because . . . .").

Plaintiff argues that instead of "disregarding" Dr. Lim's statement, the ALJ was required to "translate the terms . . . based on a reasonable interpretation of their meaning given the context of the report." [Dkt. No. 12 at 13.]  But this isn't a case in which the doctor used a worker's-compensation term to describe the degree of accommodation required in language different from Social Security terms.  Dr. Lim's statement that Plaintiff had "visual limitations in the left eye" does not opine that those limitations affected her ability to work or required any accommodations at all to do so.  There was nothing for the ALJ to translate.

Plaintiff argues that the ALJ "should have recontacted [Dr. Lim] for further elaboration."  [Id.]  When determining disability, the ALJ has a "duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Garcia v. Comm'r Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted).  An ALJ's duty to develop the record is triggered "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (as amended).

But "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal," and courts will excuse failure to do so only "when necessary to avoid a manifest injustice."  *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended); *see Sanchez v. Berryhill*, No. 1:15-cv-00510-EPG, 2017 WL 1709326, at *3 (E.D. Cal. May 3, 2017) ("A manifest injustice is . . . an error in the trial court that is direct, obvious, and observable[.]" (citation omitted)).  Plaintiff was represented by counsel at the hearing.  [See AR 32.] The ALJ specifically asked whether the record was complete, and counsel responded that he had requested records from Orange County Foot & Ankle

and "other than that, the record is complete." [AR 35-36.]    And Plaintiff did not raise the issue to the Appeals Council.  [*See* AR 299-301.]  Thus, Plaintiff has waived her argument that the ALJ erred by not recontacting Dr. Lim.  *See Meanel*, 172 F.3d at 1115; *see also Juan R. v. Kijakazi*, No. 2:20-CV-11257-GJS, 2022 WL 3018056, at *3 (C.D. Cal. July 29, 2022) (explaining that "courts have determined that when counsel represents a claimant at the hearing and indicates the record is 'complete,' the claimant waived any challenge that the ALJ erred by not developing the record"; collecting cases). And no manifest injustice arises from finding waiver here because, as explained earlier, Plaintiff has not presented any evidence of specific limitations arising from her left-eye condition.

For all these reasons, the ALJ did not err in evaluating Dr. Lim's opinion.

### C.    The ALJ Properly Evaluated Plaintiff's Subjective Symptom Statements and Testimony Concerning Her Diabetic Polyneuropathy

#### 1.    Applicable Law

In the absence of proof of malingering, an ALJ may reject a litigant's statements and testimony by identifying "specific, clear, and convincing" reasons supported by substantial evidence.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (as amended).  This requires the ALJ to "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony." *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (quoting *Treichler*, 775 F.3d at 1102); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (as amended).  An ALJ may consider a variety of factors in analyzing the believability of a claimant's symptom testimony, including "ordinary techniques of credibility evaluation." *Burch*, 400 F.3d at 680; *Evans v. Berryhill*, 759 F. App'x 606, 608 (9th Cir. 2019) (same).  A court must "review only the reasons provided by the

ALJ in the disability determination and may not affirm the ALJ on a ground
upon which [s]he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir.
2007).  Courts, therefore, may not speculate on the basis for unexplained
conclusions but rather must consider only the reasoning actually given by the
ALJ. *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

An ALJ can consider whether a lack of objective medical evidence
supports a claimant's allegations, but that "cannot form the sole basis" for
discounting subjective symptom testimony.  *Burch*, 400 F.3d at 681; *Davis v.
Berryhill*, 736 F. App'x 662, 665 (9th Cir. 2018).  If an ALJ impermissibly
relies "on one of several reasons in support of an adverse credibility
determination," the error is harmless if "the ALJ's remaining reasoning and
ultimate credibility determination were adequately supported by substantial
evidence in the record." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d
1155, 1162 (9th Cir. 2008) (citation and emphasis omitted).

### 2.    Plaintiff's Subjective Symptom Statements and Testimomy

In a March 7, 2020 Exertion Questionnaire, Plaintiff stated that she
lived in a house with family.  [AR 381.]  She "tr[ied] to walk" but "d[id]n't
really know how far [she] could walk" and "ha[d] to take breaks in between."
[*Id.*]  She could climb stairs but got "out ove [sic] breathe [sic]" and "tr[ied] to
only go up the stairs once a day." [AR 382.]  She could lift "nothing heavy."
[i.]  She did her own grocery shopping alone when getting "something for that
day," but her husband went with her when she shopped "for the week."  [i.]
She cooked at home, but it took her three hours.  [*Id.*]  She was able to
"sweep," but it "t[ook her] a while" because of her wrist, shoulder, and leg.
[*Id.*]  She took her child to school, or her child would drive and Plaintiff would
drive home alone.  [*Id.*]  She watered her plants "if not to [sic] cold," as the
"cold bother[ed her] back and left leg & side."  [*Id.*]  She slept seven hours, but
"most of the time [she was] just laying [sic] in bed." [AR 383.]  Whether she

15

required rest or naps during the day "depend[ed] on how cold" it was because her "left side hurt[] and burn[ed]." [*Id.*] She used a brace when it was cold or when her back hurt. [*Id.*] Her left side burned, her back bothered her, and her "hand & wrist hurt." [*Id.*] She couldn't get comfortable because of her left shoulder and leg. [AR 384.] In a December 3, 2020 Disability Report, Plaintiff stated that she had been "using [a] cane since 10-29-2020." [AR 388.]

In a December 27, 2020 Exertion Questionnaire, Plaintiff stated that her left side "always fe[lt] like" it was "on fire." [AR 396.] Her lower back hurt "a lot," and her right hands and wrists hurt. [Id.] Her "feet up to [the] middle of [her] calf" were "numb and so [were her] hands." [AR 396, 398.] She couldn't "keep a straight line while writing" if she took her medications during the day. [AR 398.] She "just want[ed] to sleep and not do anything [but] just stay in [her] bed." [*Id.*] She was "always tired" and didn't "want to do anything." *[Id.]* She didn't "do much around the house," but she did "try to wash dishes, sweep and wash clothes but it t[ook] all day," so "most of the time" her "daughter help[ed her]." [AR 396.] She "use[d] a cane to walk around," and her "therapist told [her] to use" it so she wouldn't "fall and lose [her] balance." [*Id.*] She "use[d] the basket for support" at the store. [*Id.*] She climbed stairs "only once . . . to gat [sic] to sleep," and "half way up [she was] sometimes out of breath." [AR 397.] She did her own grocery shopping, but someone went with her so she was "not carrying anything heavy." [*Id.*] She cleaned her own home, but her daughter helped her "finish what [she] d[id]n't finish." [*Id.*] She "sometimes" watered her plants "just to get out and feel the sun . . . for a few minutes" because she "g[o]t cold and [her] leg & back hurt." [*Id.*] She had difficulty finishing her housework because she would "sit and then not want to get back up to finish," as her back and the "left side of [her] body [were] not wanting to get up." [AR 399.] She slept between four and five hours and "toss[ed] and turn[ed] most of the night." [*Id.*] She

"sometimes" needed rest periods or naps during the day.  [*Id*.]  She used a
cane to walk "to avoid . . . losing [her] balance" and used a brace on her right
hand when her "hand and wrist hurt a lot [m]ybe [sic] 2-3 weeks at a time."
[AR 399-400.]  The left side of her body "just burn[ed] all day & night and
[her] back really bother[ed] her] and so [did her] right hand & left arm."  [AR
399.]

In a January 7, 2021 Exertional Questionnaire, Plaintiff's answers were
essentially unchanged.  She stated that her feet and hands were numb, it was
"hard to put [on] and take off [her] bra," and someone helped her do it.  [AR
401-02.]  She didn't "do much around the house" but tried to "wash dishes,"
"sweep," and "wash clothes."  [AR 401.]  She didn't fold laundry.  [*Id*.]  It took
"all day" to do the dishes, sweeping, and clothes, and she sat and took breaks.
[*Id*.]  She didn't "do much lifting" and "always carr[ied] the bag that ha[d] less
in it so [she] ha[d] a lot of bags."  [AR 403.]  She could carry "not much and not
far."  [*Id*.]  She tried to go to the grocery store "every three days" with
someone.  [*Id*.]  She tried to water her plants outside "every three days."  *[Id*.]
She had difficulty finishing housework because she "worried [she] w[ould]
drop something and  . . . loose [sic] balance and fall."  [AR 404.]  She found it
"very hard to do everyday things like put on a bra [and] tie [her] shoes."  [AR
405.]  Her left shoulder, left thumb, right wrist, and lower back hurt.  [*Id*.]
The numbness in her feet and hands made it "hard to function."  [*Id*.]

In a March 4, 2021 Disability Report, Plaintiff stated that she "f[ou]nd
[her]self using the cane more often[] and going to physical therapy."  [AR 409.]
She had a growth on both feet.  [*Id*.]  She didn't go for walks anymore because
she was "afraid to fall or loose [sic] balance."  [AR 415.]  She took a long time
to finish household tasks because she was "taking a lot of breaks," and "at the
end of the day" she was "just exhausted with doing the bare minimum."  [*Id*.]
She "experience[d] a lot of pain and [a] burning sensation in [the] left side of

17

the body." [*Id.*]

Plaintiff testified at the May 2022 hearing that she had swelling inside her eyes and received a shot in each eye "every six weeks to control the swelling so that [she] d[id]n't lose [her] eyesight." [AR 38.] But it was "back pain" "and [her] foot" that "mainly prevented [her] from continuing to work." [*Id.*] She had "something on [her] foot that [she] c[ould]n't stand very long," and she "c[ould]n't sit very long." [*Id.*] If she was sitting on a chair that didn't have a cushion, she had to "get up and move around, and then . . . sit back down." [*Id.*] Then she would "get up and move around." [*Id.*] The "pain [was] just too much" as it related to her back. [*Id.*] She lived in a house with stairs, but she "only [went] up once and c[a]me down once" a day. [AR 39.] She came down in the morning and went "back up when [she was] ready to go to bed." [Id.] She hung onto the rail and went up "very carefully" because she had "slipped twice." [*Id.*] Her husband and three grown children lived with her. [*Id.*] She drove herself when she had to go to the doctor's office and there was "nobody [t]here and it [was] close by." [AR 39-40.] But someone "usually" took her. [AR 40.] She had no problems driving, but she couldn't drive herself back when she needed to get shots in her eyes. [*Id.*]

She had a "mass at the bottom of the arch" of her foot that was "bulging out." [AR 41.] When she wore shoes, it "bother[ed her] because" it "rubb[ed] up on the . . . shoe . . . every time [she] walk[ed], every time [she] move[d]." [*Id.*] Her foot was swollen, and the left side of her body was "always on fire." [*Id.*] The mass on her foot was "getting bigger." [AR 42.]

She also had problems with her hands and back and was "recently diagnosed" with fibromyalgia. [*Id.*] She had neuropathy in her hands and feet. [*Id.*] The left side of her body was "always more swollen than the right." [AR 43.]

She could stand for "maybe half an hour" before needing to sit. [*Id.*]

18

How long she needed to sit depended on what kind of chair it was.  [*Id.*]  She could sit for half an hour "give or take."  [*Id.*]  She used a cane "most of the time to walk" because she "tend[ed] to kick the floor sometimes" and "take a dive."  [AR 44.]  She used a cane to "make sure that [she] d[id]n't lose [her] balance."  [*Id.*]

She first testified that she didn't do household chores but clarified that "[i]f [she did], it t[ook] . . . all day" or "a while" to do them.  [AR 45.] Showering and dressing took "a little longer . . . because of [her] back situation."  [AR 46.]  It took a "long time to take the bra off, put it back on; put the pants on, take them off."  [*Id.*]  It was the "[s]ame thing with socks."  [*Id.*] "Shoes . . . t[ook] a longer time."  [*Id.*]

### 3.    The ALJ's Decision

The ALJ found that Plaintiff's

> medically determinable impairments could reasonably be
> expected to cause the alleged symptoms.  However, [her]
> statements concerning the intensity, persistence and limiting
> effects of these symptoms [we]re not entirely consistent with the
> medical evidence and other evidence in the record.

[AR 21.]  She partially discounted Plaintiff's subjective symptom statements and testimony because they were inconsistent with the objective medical evidence, her conservative treatment, her noncompliance with treatment recommendations, and her improvement with treatment.  [*See* AR 22-24.]

### 4.    Analysis

Plaintiff contends that the ALJ did not properly evaluate her statements and testimony concerning her diabetic neuropathy.  [Dkt. No. 12 at 14-18.]  She does not challenge the ALJ's evaluation of her statements and testimony concerning her other impairments.  The ALJ did not err..]

19

### a)   Objective Medical Evidence

The ALJ properly discounted Plaintiff's subjective symptom statements and testimony because they were at least in part inconsistent with the objective medical evidence.  *See Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (ALJ's conclusion that objective medical evidence was inconsistent with plaintiff's symptom statements was specific, clear, and convincing reason for discounting his statements).  "After careful consideration of the entire record," the ALJ found some of Plaintiff's subjective symptom statements and testimony unsupported by and inconsistent with that evidence.  [AR 20; see AR 21-24]; *see also Bell-Shier v. Astrue*, 312 F. App'x 45, 49 (9th Cir. 2009) (upholding ALJ's rejection of plaintiff's pain and limitation claims when ALJ "examine[d] the entire record").

During Dr. Lim's September 28, 2020 consultative internal-medicine evaluation, Plaintiff's range of motion in the back and extremities was normal, and motor function was intact.  [AR 21 (citing AR 578).]  Her grip strength was 25 pounds with the right hand and 20 pounds with the left [AR 577], but otherwise her strength was "5/5 throughout without focal motor deficits" [AR 578].  In May 2021, neurologist Surjit Kahlon evaluated Plaintiff.  [AR 22 (citing AR 968-71).]  Plaintiff exhibited 4+ to 5/5 motor strength on the right side, "weak" left grip, decreased reflexes in all extremities, withdrawn plantars, and "somewhat decreased" and "somewhat inconsistent" sensation.  [AR 22 (citing AR 969).]  The strength findings of "5/5 throughout" were at least somewhat inconsistent with Plaintiff's claims in the March 2020 Exertion Questionnaire that she could lift "nothing heavy" [AR 382] and the December 2020 Exertion Questionnaire that someone went shopping with her so that she was "not carrying anything heavy" [AR 397]. Moreover, the reduced grip-strength findings do not diminish that inconsistency:

Grip strength is not synonymous with lifting ability.  Grip strength measures the force grip of a hand and represents the power of squeezing between the thumb and fingers.  Lifting involves picking up a load with the legs, arms, and torso.  *Hope v. Astrue*, No. ED CV 10-93 PJW., 2011 WL 2135054, at *1 (C.D. Cal. May 31, 2011) (citations omitted); *see also Bauslaugh v. Astrue*, No. EDCV 09-1853-MLG., 2010 WL 1875800, at *5 (C.D. Cal. May 11, 2010) (noting that "[l]ifting and carrying is defined by the Social Security Regulations as an exertional limitation, while fingering and grasping is a nonexertional limitation.  Thus, under the Regulations, the ability to grip and grasp is not related to the ability to lift and carry").

The ALJ noted that although a slow gait was observed by Dr. Lim and in the physical-therapy records, "persistent gait abnormalities [we]re not documented elsewhere in the medical record."  [AR 23.]  Indeed, Plaintiff was often noted to have a "normal gait."  [See AR 696 (Aug. 2021), 700 (May 2021), 704 (Apr. 2021), 1185 (Nov. 2021), 1182 (Feb. 2022).]  These normal gait findings are inconsistent with Plaintiff's claim in her December 2020 Exertion Questionnaire that her diabetic neuropathy caused gait problems.  [AR 396.]

For all these reasons, the ALJ properly partially discounted Plaintiff's subjective symptom statements and testimony concerning her diabetic neuropathy because they were at least in part inconsistent with the objective medical evidence.  *See Brown-Hunter*, 806 F.3d at 493; *Kitchen*, 82 F.4th at 739.  Moreover, any error was harmless because as explained below, the ALJ gave three other valid reasons for discounting Plaintiff's subjective symptom statements and testimony.  *See Howland v. Saul*, 804 F. App'x 467, 470-71 (9th Cir. 2020) (holding that ALJ's error in relying on claimant's daily activities to discount her subjective symptom testimony was harmless because ALJ offered other specific, clear, and convincing reasons for doing so).  *Id*.

### b)  Conservative Treatment

Routine, conservative treatment can be enough to discount a claimant's subjective testimony regarding the limitations caused by an impairment. *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007).  Not seeking an "aggressive treatment program" permits the inference that symptoms were not "as all-disabling" as the claimant reported.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).  The amount of treatment is "an important indicator of the intensity and persistence of [a claimant's] symptoms." §§ 404.1529(c)(3), 416.929(c)(3).  If, however, the claimant has a good reason for not seeking more aggressive treatment, conservative treatment is not a proper basis for rejecting the claimant's subjective symptoms.  *Carmickle*, 533 F.3d at 1162.

The ALJ noted that although electrodiagnostic studies in June 2021 "suggested sensory neuropathy," Plaintiff's neurologist recommended only that Plaintiff "follow up" with pain management and see the neurologist "as needed."  [AR 22 (citing AR 989-90).]  Nothing shows that Plaintiff sought treatment for sensory neuropathy after July 2021, as Defendant notes [Dkt. No. 19 at 11], or that she had a good reason for not doing so in light of her claim that her neuropathy was disabling.  Therefore, the ALJ did not err in discounting Plaintiff's subjective symptom statements and testimony as inconsistent with her conservative treatment for her diabetic neuropathy..

### c)  Noncompliance with prescribed treatment

An ALJ may rely on an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  The ALJ noted that medical records showed compliance issues with Plaintiff's diabetes treatment [AR 22-23 (citing AR 581, 1060, 1066, 1071, 1079)], suggesting that her symptoms were not particularly bothersome.  Despite her complaints of disabling pain,

Plaintiff specifically declined pain-management injections from her pain-management physician.  [AR 23 (citing AR 666, 671).]  She has offered no explanation, much less an adequate one, for failing to follow her prescribed course of treatment.  Therefore, the ALJ did not err in considering this failure in discounting her subjective symptom statements and testimony.  *Ghanim*, 763 F.3d at 1163.

### d)    Improvement with treatment

Next, the ALJ properly considered that Plaintiff's conditions were controlled or responsive to treatment. [AR 23]; *see Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."); *Presley-Carrillo v. Berryhill*, 692 F. App'x 941, 945 (9th Cir. 2017) (upholding discounting of claimant's testimony concerning disabling nature of symptoms when it conflicted with effective treatment).  Plaintiff's A1C level was at goal within six months of an initial endocrinology consultation, as the ALJ noted.  [AR 23 (citing AR 1016, 1022, 1113, 1124).]  And Plaintiff's neurologist found that physical and occupational therapy "helped a lot" with Plaintiff's symptoms, although she remained symptomatic.  [Id. (citing AR 695).]  Physical therapy records also indicated improvement.  [Id. (citing AR 839-42, 901, 1123).]

Further, the ALJ specifically noted that gait improvement was observed in the physical therapy records.  [*Id*. (citing AR 838, 878).]  Plaintiff argues that "while [her] gait improved during therapy, it was still 75% of normal at the time of discharge from the program."  [Dkt. No. 12 at 18.]  But even 75 percent of normal was inconsistent with the statements in Plaintiff's December 27, 2020 Exertion Questionnaire that she needed to "use a cane to walk around" so she didn't "fall and lose [her] balance" [AR 396] and "use[d] the basket for support" at stores [id.].  It was also inconsistent with the statement in Plaintiff's March 4, 2021 Disability Report that she couldn't go

for walks anymore because she was "afraid to fall or loose [sic] balance." [AR 415.] And as noted, Plaintiff was often found to have a "normal gait," including during the latter part of the relevant period. [*See* AR 696 (Aug. 2021), 700 (May 2021), 704 (Apr. 2021), 1185 (Nov. 2021), 1182 (Feb. 2022).] Therefore, the ALJ did not err in discounting Plaintiff's subjective symptom statements and testimony concerning her diabetic neuropathy based on her improvement with treatment.

For all these reasons, the ALJ properly evaluated Plaintiff's subjective symptom statements and testimony concerning her diabetic neuropathy.

### D. The ALJ Properly Resolved an Apparent Conflict Between the VE's Testimony and the Dictionary of Occupational Titles

Plaintiff argues that the ALJ erred in failing to resolve an apparent conflict between the VE's testimony that a "person limited to occasional reaching with the left upper extremity could perform work as a photographer" and the "DOT['s] desc[ription of the] occupation." [Dkt. No. 12 at 19.] For the reasons discussed below, the ALJ did not err.

#### 1. Applicable law

The photographer job requires reaching "[f]requently," or "from 1/3 to 2/3 of the time." See DOT 143.062-030, 1991 WL 647131 (Jan. 1, 2016).

"When there is an apparent conflict between the vocational expert's testimony and the DOT — for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle — the ALJ is required to reconcile the inconsistency." *Lamear v. Berryhill*, 865 F.3d 1201, 1206 (9th Cir. 2017) (citation omitted).

> [N]ot all potential conflicts between an expert's job suitability recommendation and the [DOT's] listing of maximum requirements for an occupation will be apparent or obvious. [A]n ALJ need only follow up on those that are.

24

1    *Gutierrez v. Colvin*, 844 F.3d 804, 807-08 (9th Cir. 2016) (citation

2    omitted).

3        **2.    The VE's testimony**

4        At the May 2022 hearing, the ALJ questioned the VE as follows:

5        Q.    . . . If we assume a hypothetical person who was 48

6    years old at her alleged onset date, has some college education, is
     literate, speaks English, and can perform the demands of work

7    within the following RFC.  She can lift and/or carry 20 pounds
     occasionally, 10 pounds frequently.  She can do frequent reaching,

8    handling, fingering, feeling, pushing, and pulling with the right
     dominant upper extremity.  She can occasionally use the left hand

9    for reaching, pushing, and pulling, but can frequently use the left
     hand for handling, fingering, and feeling.  She can do occasional

10   foot pedals bilaterally.  She can occasionally climb ramps and
     stairs, ladders, ropes, and scaffolds.  She can occasionally crouch,

11   but can frequently stoop, kneel, crouch, and crawl.  She can stand,

12   walk, and or sit six hours out of an eight-hour day each.  Could

13   this person do [Plaintiff's] past-relevant work [as a
     photographer]?

14       A.    Yes.

15       Q.    And that'd be both per the DOT and as actually

16   performed?

17       A.    That's correct, Judge, yes.

18       Q.    And the disparity in the reaching, handling, and
     fingering between the right and left upper extremity is more per

19   your own experience then [sic] per the DOT because the DOT does
     not make that distinction.  Is that correct?

20       A.    That's correct.  And based on what you told me, and

21   then combining that with my professional experiences, I felt
     there'd be no impact on doing their past — usual and customary

22   work.

23   [AR 48-49.]

24       **3.    The ALJ's decision**

25   The ALJ found that Plaintiff could perform her past relevant work as a

26   photographer:

27       After comparing [Plaintiff's] residual functional capacity with the

28       physical and mental demands of this work, and based on the

25

vocational expert's testimony, the undersigned finds that [Plaintiff] is able to perform it as actually and generally performed.

The vocational expert confirmed that the DOT does not distinguish right from left with respect to reaching, handling, and fingering requirements and that his testimony regarding this subject reflected his professional experience.  Pursuant to SSR 00-4p, the undersigned relies on the vocational expert's documented qualifications in accepting this testimony.

[AR 24.]

**4.**   Analysis

The ALJ recognized an apparent conflict between the VE's testimony and the DOT because she directly questioned the VE about the "disparity" between the reaching, handling, and fingering abilities with the right versus the left upper extremity.  [AR 48-49.]  And the VE testified that based on "what [the ALJ] told [him] combin[ed] with [the VE's] professional experiences," there would be "no impact on doing" the photographer job.  [AR 49.]  In her decision, the ALJ noted the VE's explanation of the apparent conflict and "[p]ursuant to SSR 00-4p," expressly "relie[d] on the vocational expert's documented qualifications in accepting this testimony."  [AR 24.]  The ALJ reasonably relied on the VE's expertise and experience.  *Biestek*, 587 U.S. at 105 (VE's "testimony may count as substantial evidence even when unaccompanied by supporting data"); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("An ALJ may take administrative notice of any reliable job information, including information provided by a VE.").  The VE had over 40 years of experience as a vocational consultant and counselor [AR 449-51], and Plaintiff did not object to his qualifications to testify [AR 46-47] or to that specific testimony [see AR 48-49].  The DOT description of the photographer job doesn't state whether the frequent reaching involved can be done primarily with one hand, as the VE acknowledged.  [Id.]  But the VE testified that it could, based on his education and vocational-consulting experience.

[Id.]  The ALJ reasonably relied on this expertise.  *Biestek*, 587 U.S. at 105;
Bayliss, 427 F.3d at 1218.

Plaintiff is incorrect that *Lamear* requires a different result.  In
*Lamear*, a VE testified that the plaintiff, who could only occasionally handle,
finger, and reach with his nondominant hand, could perform the jobs of office
helper, mail clerk, and parking-lot cashier, all of which required frequent
handling, fingering, and reaching.  865 F.3d at 1203.  The ALJ did not ask the
VE to reconcile any potential conflict, and the VE did not offer any
explanation.  *Id*. at 1204.  The Ninth Circuit concluded that the ALJ's failure
to ask the VE about the conflict was reversible error because it could not
determine from the record whether the jobs in question required use of both
hands on a frequent basis.  *Id*. at 1206-07.  In contrast, here the ALJ asked
the VE about the potential conflict, and the VE resolved it based on his
expertise.

Importantly, Plaintiff's counsel had an opportunity to cross-examine the
vocational expert on this issue.  Indeed, counsel questioned the VE on other
issues but did not raise any perceived inconsistencies between the VE's
testimony and the reaching requirements in the DOT job description.  [AR 51-
52]; *see Solorzano v. Astrue*, No. ED CV 11-369-PJW., 2012 WL 84527, at *6
(C.D. Cal. Jan. 10, 2012) ("[Counsel] have an obligation to take an active role
and to raise issues that may impact the ALJ's decision while the hearing is
proceeding so that they can be addressed.").  The ALJ was therefore entitled
to rely on the vocational expert's testimony.  *See Solorzano*, 2012 WL 84527,
at *6 ("Counsel are not supposed to be potted plants at administrative
hearings.").  The ALJ did not err.

## IV.    CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING the Acting Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: March 20, 2025

PATRICIA DONAHUE
United States Magistrate Judge

28